```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
EDUARDO (YHAEELLY) GALVEZ GOICOCHEA,          :
                                              :   Civil Case No. 21-CV-01330
                   Plaintiff,                 :   (GRB)(AKT)
          -against-                           :
                                              :
SUFFOLK REGIONAL OFF-TRACK BETTING CORP.,     :
DELAWARE NORTH GAMING MANAGEMENT IN           :   FIRST AMENDED
SUFFOLK LLC d/b/a JAKE'S 58 CASINO HOTEL      :   COMPLAINT
AND YOKASTY VARGAS, AS AIDER AND              :
ABETTOR,                                      :   PLAINTIFF REQUESTS A
                                              :   TRIAL BY JURY
                   Defendants.                :
------------------------------------------------------------------ X
```

Plaintiff, Eduardo Galvez Goicochea ("Plaintiff" or "Ms. Galvez"), by her attorney, Brendan Chao, for her Complaint against Defendants Suffolk Regional Off-Track Betting Corp., ("OTB"), Delaware North Gaming Management in Suffolk d/b/a Jake's 58 Casino Hotel ("Jake's 58" or the "Casino"), and Yokasty Vargas ("Defendant Vargas" or "Ms. Vargas"), individually as aider and abettor (all collectively referred to as "Defendants"), alleges as follows:

## THE PARTIES

1. Plaintiff was employed by OTB from in or about May 2017 until February 4, 2020.

2. Jake's 58 is a hotel that also provides gambling and entertainment to the general public, and Plaintiff worked within the Casino.

3. OTB is a corporation authorized to run a casino with up to 1,000 slot machines; that right was licensed to Jake's 58 in Islandia, N.Y., which was, upon information and belief, opened by Delaware North in 2017.

4. Jake's 58 maintained centralized control over the interrelated operations of OTB. Upon information and belief, they share common ownership and financial control, as well as

1

common management and control over labor relations and personnel policies and practices, including hiring and firing of employees.

5. At all relevant times, OTB and its affiliates Jake's 58 (referred to herein as "the Company"), were operated as a single, integrated enterprise, or single employer, or as joint employers.

6. Upon information and belief, OTB purchased Jake's 58 on or about May 28, 2021, for approximately $120 million.

7. Defendant Vargas was an OTB employee, and she was Plaintiff's direct supervisor. As Plaintiff's supervisor, Defendant Vargas had the power to make personnel decisions regarding her employment. Defendant Vargas also aided and abetted the unlawful conduct described herein. Defendant Vargas, upon further information belief, resides in Suffolk County, New York.

## THE NATURE OF THE ACTION

8. Ms. Galvez brings this action against Defendants to seek redress for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.* Specifically, Defendants discriminated against Ms. Galvez because of her gender.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action under 28 U.S.C. § 1331, and principles of supplemental jurisdiction, 28 U.S.C. § 1367.

10. Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about November 11, 2020.

11. On or about December 18, 2020, counsel for Plaintiff received a Dismissal and Notice of Right to Sue from the EEOC. Less than ninety days have elapsed since Plaintiff's

receipt of the Notice and the filing of this Complaint.

12. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in the Eastern District of New York.

**FACTS**

13. Ms. Galvez began working for OTB in May 2017 in Jake's 58 Casino, and her employment ended on February 4, 2020.

14. Ms. Galvez was employed by Defendants as an Environmental Services ("EVS") Attendant.

15. Her duties included cleaning the Casino's machines, chairs, emptying trash baskets, picking up trash left by customers, and cleaning the restrooms.

16. Ms. Galvez was an excellent employee, and she always performed her duties in a diligent, thorough, professional, and competent manner.

17. Ms. Galvez was born a male and her birth name is Eduardo Galvez Goicochea, but her gender identity is female.

18. When she was hired by Defendants, employees were allowed to use a nickname on their name tags which permitted Plaintiff to use the female name she identifies with "Yhaeelly."

19. In or about May 2018, the supervisor of Food and Beverages for Jake's 58 at the time, Jolene Lavelle ("Lavelle"), offered Ms. Galvez a position as a cocktail waitress and she accepted.

20. Ms. Galvez was considered an OTB employee, so Ms. Lavelle told her she

had to put in two weeks' resignation notice with OTB in order to transfer her employment to Jake's 58.

21. Ms. Galvez's Environmental Services division and the cocktail waitresses both reported into the Food and Beverages department for the Casino.

22. Ms. Galvez submitted her resignation notice to OTB, and after two weeks she went to the kitchen to look for Ms. Lavelle. A morning supervisor told Ms. Galvez that Ms. Lavelle no longer worked for the Casino.

23. Ms. Galvez spoke to the new supervisor who replaced Ms. Lavelle, Toni (last name unknown), and explained that Ms. Lavelle had initiated her transfer to the position of cocktail waitress which was to start after Ms. Galvez's two-week resignation notice to OTB.

24. Toni told Ms. Galvez to come back in two days to begin training as a cocktail waitress; she returned as instructed and was trained as a cocktail waitress.

25. A day passed and Toni asked Ms. Galvez to come in to talk.

26. Ms. Galvez went to the meeting, and Toni said, "I have good news and bad news." "The good news is that there is a dishwasher position available, and the bad news is that there are no positions for cocktail waitresses."

27. Ms. Galvez saw Toni go into her supervisor's office, Eileen (last name unknown). Toni came out and confirmed to Ms. Galvez that there was no position for her except as a dishwasher or a position in the Utilities department.

28. Thereafter, Ms. Galvez began to hear comments at work that she could not work as a cocktail waitress because those positions were for women referring to the fact that Ms. Galvez was born male.

29. Ms. Galvez now found herself without a job because she had resigned from her previous position to transfer to the cocktail waitress position. Ms. Galvez reached out to Eileen and asked to be reinstated as an EVS Attendant, which she was.

30. Two weeks after going back to her position as an EVS Attendant, Ms. Galvez learned that five female cocktail waitresses were hired.

31. In or about October 2019, Ms. Galvez switched to the morning shift.

32. After the switch to mornings, Ms. Galvez explained to Eileen that she had one hundred hours of paid-time off ("PTO") owed. Eileen told her to speak to Nora (last name unknown) a Human Resources ("HR") representative. Nora said she was new and did not know what happened but that her clock-in/out records were lost.

33. Ms. Galvez never received the PTO she was owed, which was the equivalent of $1,300.00.

34. Upon information and belief, this elimination of her PTO was part of a pattern and practice of treating her differently because of her gender.

35. In or about November 2019, Defendant Yokasty Vargas began working on Ms. Galvez's shift as her direct supervisor.

36. From the start, Ms. Vargas treated Ms. Galvez poorly, and said that her work was bad. Ms. Galvez noticed that she only treated her this way.

37. In or about November 2019, Ms. Galvez's co-workers told her that Ms. Vargas was trying to get them to buy Ms. Galvez a birthday cake. Ms. Galvez found this odd because she was aware that Ms. Vargas told other workers that she wanted to get rid of her.

38. On or about November 12, 2019, Ms. Vargas posted on the wall of the

storage area a list of EVS employees who had November birthdays. Ms. Galvez chose to use a nickname (Yhaeelly) to identify herself while at work so her birth gender would not be revealed. Ms. Vargas, however, used Ms. Galvez's birth name, Eduardo, on the list which essentially "outed" her as a male.

39. When Ms. Galvez saw her name posted on the list she got nervous at the thought that everyone would see her birth name and know that she was transgender. She crossed out the name just before going home for the day.

40. On or about November 13, 2019, Ms. Galvez noticed that other employees had crossed out their names as well.

41. Later that morning, Ms. Vargas approached Ms. Galvez and asked "Why did you erase the names from the list?" Ms. Galvez told her that she had only erased her name and that she had no right to list her name with her birth date on the post because an employee's personal information is private and only HR and Managers can use the information.

42. Ms. Galvez asked Ms. Vargas how she got access to the information and Ms. Vargas said that the manager, Eileen, had given it to her to post.

43. On or about November 14, 2019, Eileen called Ms. Galvez to the office and said that she was going to change Ms. Galvez's name to Yhaeelly on the list.

44. Ms. Galvez told her that she had no right to expose her personal information knowing that she is transgender.

45. Several days later, Ms. Vargas asked Ms. Galvez why she did not have her ID card, and Ms. Galvez told her "Here it is," and showed it to her. It was attached to a lanyard she wore around her neck.

46. Ms. Vargas said that one of the bosses, Joe (last name unknown), had reported Ms. Galvez for not wearing her given birth name ("Eduardo") on her ID card and told her to go to HR.

47. Ms. Galvez went to the HR office. Eileen and Ms. Vargas were both there. Ms. Vargas spoke first and said that they needed to put Ms. Galvez's birth name on her employee ID because of a new company policy.

48. Eileen continued and confirmed Ms. Vargas's statement saying that the boss, Joe, had said to put birth names on all employee ID cards. This was confirmed by HR representative who was also present. Ms. Vargas ordered a new ID with Ms. Galvez birth name ("Eduardo") and gave it to Ms. Galvez.

49. Ms. Galvez asked them why they wanted to change her name on the ID since she had used it for the past three years. She further explained that her nickname clearly identified her as a woman, but now the ID card would identify her as a man. She told them it was unfair and that it made her sad and frustrated.

50. Ms. Vargas told Ms. Galvez to hand in her old ID card, and she shredded it directly in front of Ms. Galvez; Ms. Galvez felt humiliated.

51. Ms. Galvez went back to work, but she was feeling awful and started crying because she felt she did not deserve to be treated like this.

52. Ms. Galvez put the new ID card in her pocket because she could not bear to expose her birth name.

53. Ms. Vargas told her that she had to wear the ID card with her birth name on her chest so that people, including customers, could see her name in case they needed to report her

7

for any reason. Ms. Galvez did as she was told and displayed it on her chest.

54. Ms. Galvez went to the women's bathroom to continue working despite how she was feeling. While she was cleaning the bathroom a woman came in and saw the name on the ID card "Eduardo," and told her that she was in the women's bathroom and she shouldn't be there because she was a man. Ms. Galvez started crying.

55. Two days after this last incident Ms. Galvez went to HR to complain about Ms. Vargas and everything that had happened. She told them that she did not feel comfortable using her birth name on the ID card because of bullying and discrimination. Ms. Galvez had begun to hear other staff members refer to her as a man, or say things like, "She used to be a man."

56. Some coworkers distanced themselves from her and others stopped talking to her altogether. Ms. Galvez asked Nora (last name unknown) in HR for a transfer to the afternoon shift because she felt nothing would be done about Ms. Vargas's harassment. Nora said she would investigate. Ms. Galvez reached out to her old shift supervisor from evenings and told her what was going on, and she said she would try and help her.

57. The next day Ms. Vargas laughed at Ms. Galvez as she walked past her. She later found out that Ms. Vargas was telling everyone that she had achieved her goal, which was to expose her as transgender and get everyone at work talking about it.

58. That same day Ms. Galvez called HR and she was told that Katie Park, one of the senior managers, arranged for Ms. Galvez to be given an ID card with her nickname "Yhaeelly" to wear as a name tag. She was also told to use her other ID card with the name "Eduardo" to open doors. Despite this, Ms. Galvez felt worse because she now had two ID cards.

59. Ms. Galvez continued working despite the comments she heard while at

work, and Ms. Vargas continued to take issue with everything she did; Ms. Galvez felt constantly harassed for everything. Several of Ms. Galvez's coworkers said that Ms. Vargas was unfair to her, and it appeared as though she did not want her working there.

60. On or about January 30, 2020, Ms. Galvez was nauseous and had a stomach ache. A co-worker told Ms. Vargas that Ms. Galvez was not well. Ms. Vargas told Ms. Galvez to go home and get some rest since she was not well. She was told she could come in the following day to make up the time even though it was her day off.

61. Later that afternoon, Ms. Galvez received a text from Ms. Vargas instructing her not to return to work the next day because she was sick and could be contagious to others. Ms. Vargas said this was a decision made by the manager, Eileen.

62. That same afternoon, Ms. Galvez heard from her co-workers that Ms. Vargas had told everyone from the shift that Ms. Galvez might have Corona virus.

63. Upon information and belief, Ms. Vargas spoke to Eileen and got permission to keep Ms. Galvez out from work the next day.

64. On or about February 2, 2020, Ms. Galvez was scheduled to go into work, but she still felt uncomfortable with everything going on at work; she called out sick again.

65. On or about February 3, 2020, Eileen called Ms. Galvez in the afternoon and asked that she speak with Nora from HR about the shift transfer she had requested back to the afternoon shift.

66. Eileen said there were no positions available in the afternoon, but if she wanted to resign they had the resignation paperwork ready for Ms. Galvez to sign.

67. On or about February 4, 2020, Ms. Galvez went to HR to see if she could

speak to Nora about the problems she was experiencing at work. She was told that Nora was busy and could not see her at that time.

68. Nora called Ms. Galvez later that afternoon and told her she could not do anything for her. She then emailed Ms. Galvez the resignation papers for her to sign and she signed and sent them back.

69. Ms. Galvez could no longer cope with, among other things, discrimination, hostility, loss of her PTO, and alienation that she was experiencing at work. This was especially true given that she had complained several times to HR about the mistreatment and nothing was done about her complaints.

70. Ms. Galvez never threatened to resign during her employment. She asked for a shift transfer to get away from her main aggressor, Ms. Vargas. Defendants rejected this request and invited her to resign.

71. In the end, Defendants' response to Ms. Galvez's complaints was, among other nothings, an invitation to resign. She ultimately submitted her resignation because no other way to escape the mistreatment existed.

**FIRST CAUSE OF ACTION**
**(Title VII of the Civil Rights Act – Disparate Treatment -**
**As to Corporate Defendants Only)**

72. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 71 as if separately set forth herein.

73. Plaintiff is a member of a protected class based upon her sex/gender.

74. She was qualified for the position she held as an EVS Attendant, and she was also qualified to become a cocktail waitress as evidenced by the job offer she received and

the training she underwent.

75. Plaintiff suffered an adverse employment action with respect to her position as an EVS Attendant when she was constructively terminated from that position.

76. In addition, Plaintiff lost her accumulated PTO following her return to work as an EVS Attendant after the revocation of the cocktail waitress position. Upon information and belief, this was done as part of an ongoing pattern and practice of disparate treatment based upon Plaintiff's sex/gender.

77. She also suffered an adverse employment action when the cocktail waitress job offer was rescinded. She would have earned significantly more money as a cocktail waitress than as an EVS Attendant, and the statement that "The good news is that there is a dishwasher position available, and the bad news is that there are no positions for cocktail waitresses" was a pretext for the discriminatory withdrawal of the job offer. Several days after the job offer was rescinded Defendants hired five cocktail waitresses.

78. The adverse employment actions occurred under circumstances which give rise to an inference of discriminatory intent, and were part of a continuing course of misconduct.

79. For example, Plaintiff's constructive termination occurred after she complained of harassment and discrimination, and instead of addressing her complaints Defendants offered her resignation paperwork.

80. Defendants' revocation of their cocktail waitress job offer to Plaintiff was highly suspicious given the fact that she had completed training and then was told there were no positions available despite the fact that Defendants hired five cocktail waitresses shortly thereafter.

81. The adverse employment actions taken were more disruptive than a mere

inconvenience or an alteration of job responsibilities.  Indeed, these actions resulted in the constructive termination of her employment and the loss of her PTO.  The revocation of the cocktail waitress job offer cancelled a material loss of income and benefits that would have been significantly higher than that of an EVS Attendant.

82. As outlined above, Defendants discriminated against Plaintiff in the terms, conditions, and privileges of employment on the basis of her sex/gender.

83. The foregoing conduct constitutes illegal, intentional discrimination, and unjustified disparate treatment prohibited by Title VII.

84. In so doing, Defendants acted maliciously and with reckless indifference to Plaintiff's right to be free from discrimination based on her sex/gender.

### SECOND CAUSE OF ACTION
**(Title VII of the Civil Rights Act – Hostile Work Environment - As to Corporate Defendants Only)**

85. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 84 as if separately set forth herein.

86. The harassment Plaintiff endured was sufficiently severe <u>or</u> pervasive that it altered the conditions of her employment and created an abusive working environment.

87. Plaintiff's workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe <u>or</u> pervasive that it altered the conditions of her employment, and it constituted a continuing course of conduct.

88. Plaintiff's supervisors were actively participating in her mistreatment, and their misconduct can be imputed to the Defendant employers.

89. Plaintiff subjectively perceived the environment as abusive, and the

misconduct was severe or pervasive enough to create an objectively hostile or abusive work environment as evidenced by Plaintiff's coworkers' comments to her that she was being mistreated.

90. Plaintiff suffered Defendants' hostility toward her on an ongoing daily basis. Her gender identity was called into question on a daily basis and this was both humiliating and demoralizing. The mistreatment unreasonably interfered with her ability to do her job, and it led to the revocation of a cocktail waitress job offer, loss of PTO, and the constructive termination of employment.

### THIRD CAUSE OF ACTION
**(Title VII of the Civil Rights Act – Wrongful Constructive Termination - As to Corporate Defendants Only)**

91. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 90 as if separately set forth herein.

92. Defendants, rather than directly discharging Plaintiff, intentionally and/or deliberately created an intolerable and negative atmosphere that forced her to quit voluntarily.

93. The environment that Plaintiff was forced to endure was so difficult or unpleasant that any reasonable person in her shoes would have felt compelled to resign as she did.

94. Plaintiff did not suffer one single event, but rather her constructive termination resulted from the cumulative, unabated harassment that she experienced from her supervisor and others.

95. Plaintiff's constructive termination occurred under circumstances that give rise to an inference of discrimination on the basis of her gender.

96. Plaintiff called Defendants to inquire about a shift change because of the

discriminatory mistreatment. Defendants denied the request and offered to accept her resignation.

97. Because of the ongoing nature of the harassment, its severity and/or pervasiveness and Defendants' failure to take any action, Plaintiff reasonably concluded that the harassment would continue unremedied so long as she continued to work for Defendants.

## FOURTH CAUSE OF ACTION
### (Title VII of the Civil Rights Act – Retaliation - As to Corporate Defendants Only)

98. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 97 as if separately set forth herein.

99. Plaintiff engaged in protected activity when she made several internal complaints regarding Defendants' discriminatory practices and gender-based hostile work environment.

100. Defendant took adverse employment actions, including, but not limited to revocation of Plaintiff's PTO and constructive termination with the purpose of retaliating against her because of her opposition to or participation in protected activities, causing her to suffer damages as a result of that conduct.

101. Defendants knew that its actions constituted unlawful discrimination and showed willful and/or reckless disregard for Plaintiff's statutorily protected rights.

## FIFTH CAUSE OF ACTION
### (NYSHRL Discrimination - Disparate Treatment)

102. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 101 as if separately set forth herein, including, but not limited to those allegations made in the First Cause of Action, supra.

103. New York State Human Rights Law prohibits discrimination in the

"terms, conditions or privileges of employment" or discharge of an employee based on the employee's sex. N.Y. Exec. Law § 296.

104. Pursuant to 9 N.Y.C.R.R. § 466.13(c)(1), the term "sex" when used in the Human Rights Law includes gender identity and the status of being transgender.

105. Pursuant to 9 N.Y.C.R.R. § 466.13(b)(1), "gender identity" means "having or being perceived as having a gender identity, self-image, appearance, behavior or expression whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the sex assigned to that person at birth."

106. Pursuant to 9 N.Y.C.R.R. § 466.13(c)(3), "[h]arassment on the basis of a person's gender identity or the status of being transgender is sexual harassment."

107. As outlined above, and as more specifically alleged in the First Cause of Action, supra, Defendants discriminated against Plaintiff in the terms, conditions, and privileges of employment on the basis of her sex.

108. The foregoing conduct constitutes illegal, intentional discrimination, and unjustified disparate treatment prohibited by the NYSHRL.

109. In doing so, Defendants acted maliciously and with reckless indifference to Plaintiff's right to be free from discrimination based on her sex and/or gender.

### SIXTH CAUSE OF ACTION
**(NYSHRL Discrimination – Failure to Promote/Upgrade)**

110. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 109 as if separately set forth herein.

111. Plaintiff is a member of a protected class based upon her sex/gender.

112. EVS Attendants, including Plaintiff, cleaned up the Casino after guests, and

it was widely considered a promotion, or, alternatively, an upgrade to leave the position of EVS Attendant and become a cocktail waitress where the primary responsibility was serving drinks to patrons.

113. Plaintiff applied for the cocktail waitress position for which Defendants were seeking applicants. The position of cocktail waitress is one of the highest-paid positions at the Casino. Guests tipped the cocktail waitresses for their service, and often tipped significantly more when they won. This position would have significantly increased Plaintiff's income and her prestige within the Casino.

114. Defendants initially offered the position to Plaintiff and trained her, but then subsequently revoked the job offer.

115. The position remained opened and Defendants continued to seek applicants, and subsequently hired five cocktail waitresses.

116. Plaintiff was similarly situated and was as qualified as other applicants who were offered the position of cocktail waitress, and she underwent the requisite training and no reason was given for the revocation of the cocktail waitress position.

117. Upon information and belief, Defendants' reason for revoking the job offer was because they discovered that Plaintiff was transgender after the job offer was made and they did not want such an individual working as a cocktail waitress.

## SEVENTH CAUSE OF ACTION
### (NYSHRL Discrimination – Hostile Work Environment)

118. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 117 as if separately set forth herein.

119. The harassment Plaintiff endured was sufficiently severe <u>or</u> pervasive that

it altered the conditions of her employment and created an abusive working environment.

120. Plaintiff's workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe <u>or</u> pervasive that it altered the conditions of her employment.

121. Plaintiff's supervisors were actively participating in her mistreatment, and their misconduct can be imputed to the Defendant employers.

122. Plaintiff subjectively perceived the environment as abusive, and the misconduct was severe <u>or</u> pervasive enough to create an objectively hostile or abusive work environment as evidenced by Plaintiff's coworkers' comments to her that she was being mistreated.

123. Plaintiff suffered Defendants' hostility toward her on an ongoing daily basis. Her gender identity was called into question on a daily basis and this was both humiliating and demoralizing. The mistreatment unreasonably interfered with her ability to do her job, and it led to the revocation of a cocktail waitress job offer, loss of PTO, and the constructive termination of employment.

### EIGHTH CAUSE OF ACTION
### (NYSHRL Discrimination – Wrongful Constructive Termination)

124. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 123 as if separately set forth herein.

125. Defendants, rather than directly discharging Plaintiff, intentionally and/or deliberately created an intolerable and negative atmosphere that forced her to quit voluntarily.

126. The environment that Plaintiff was forced to endure was so difficult <u>or</u> unpleasant that any reasonable person in her shoes would have felt compelled to resign as she did.

17

127. Plaintiff did not suffer one single event, but rather her constructive termination resulted from the cumulative, unabated harassment that she experienced.

128. Plaintiff's constructive termination occurred under circumstances that give rise to an inference of discrimination on the basis of her gender.

129. Plaintiff called Defendants to inquire about a shift change because of the discriminatory mistreatment. Defendants denied the request and offered to accept her resignation.

## NINTH CAUSE OF ACTION
### (NYSHRL Discrimination - Retaliation)

130. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 129 as if separately set forth herein.

131. Plaintiff engaged in protected activity when she made several internal complaints regarding Defendants' discriminatory practices and gender-based hostile work environment.

132. Defendant took adverse employment actions, including, but not limited to revocation of Plaintiff's PTO and constructive termination with the purpose of retaliating against her because of her opposition to or participation in protected activities, causing her to suffer damages as a result of that conduct.

133. Defendants knew that its actions constituted unlawful discrimination and showed willful and/or reckless disregard for Plaintiff's statutorily protected rights.

WHEREFORE, while reserving the right to seek additional damages as available, Plaintiff demands judgment against Defendants as follows:

    A.    Declaring that the acts, practices, and omissions complained of herein are

unlawful and violate Title VII and the NYSHRL;

        B.      Enjoining and permanently retraining Defendants from engaging in such conduct;

        C.      Directing Defendants to pay Plaintiff her back pay, front pay, compensatory damages including emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and damages to compensate her for past and future physical and emotional suffering, and pre- and post-judgment interest for violations of Title VII and the NYSHRL;

        D.      Directing Defendants to pay exemplary and punitive damages, as available, commensurate with Defendants' ability to pay and sufficient to punish and deter continuation of Defendants' discriminatory and unlawful employment practices;

        E.      Directing Defendants to pay an award of damages to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for harm to her professional and personal reputation;

        F.      Awarding Plaintiff reasonable attorney's fees and costs as provided by law;

        G.      Ordering that Defendants institute and carry out policies, practices, and programs that provide equal employment opportunities for all employees regardless of gender, and that it eradicate the effects of their past and present unlawful practices;

        H.      Appointing a monitor to ensure that Defendants complies with injunction provisions of any decree that the Court orders;

        I.      Ordering that this Court retain jurisdiction over this action to ensure Defendants comply with such a decree; and

        J.      Awarding such other legal and equitable relief as this Court deems necessary, just and proper.

Dated: July 1, 2021
       Rockville Centre, N.Y.

                                                BRENDAN CHAO
                                                Attorney & Counsellor at Law

By:   *Brendan Chao*

                                                Brendan Chao (BC8811)
                                                Attorney for Plaintiff
                                                50 Merrick Road, Suite 200
                                                Rockville Centre, N.Y. 11570
                                                (516) 466-2033

TO: All Defendants           **VIA ECF**